IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

SCOTTIE EPPERSON, co-executor of the    :    Case No. 1:23-cv-50
estate of FRED R. LANGLEY, deceased,    :
   :    Judge Matthew W. McFarland
               Plaintiff,    :
   :
       v.    :
   :
LEXINGTON INSURANCE COMPANY,    :
   :
             Defendant.    :

---

## ORDER AND OPINION

---

This matter is before the Court on Defendant's Motion for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment (Docs. 28, 29.) The parties fully briefed both Motions. (*See* Docs. 31, 32, 33, 34.) Thus, this matter is ripe for review. For the following reasons, Plaintiff's Motion for Partial Summary Judgment (Doc. 29) is **DENIED**. Defendant's Motion for Summary Judgment (Doc. 28) is **GRANTED.**

## FACTS

### I.    The Insured Property

This insurance dispute centers around Plaintiff Fred Langley's property ("Insured Property") in Cincinnati, Ohio. (Epperson Decl., Doc. 28-2, ¶¶ 3, 7-8.) Langley had financially facilitated Tree Shaker Acquisitions, LLC's purchase of the Insured Property, which included a 78,000 square-foot building, and after the LLC defaulted on its payment obligations, Langley initiated foreclosure proceedings. (*Id.* ¶¶ 4, 6-7.) He obtained the

deed to the Insured Property on or about September 9, 2021. (*Id.* ¶ 8.) On September 17, 2021, Langley's agent, Paul Plattner, visited the Insured Property and discovered the building in ruin. (Plattner Dep., Doc. 24, Pg. ID 331-34.) Plattner witnessed water pouring out of the building in many places and could see more water inside through the windows. (*Id.*) Additionally, once inside, Plattner observed mold on all three levels of the building. (*Id.* at Pg. ID 334-35, 362-63.) Langley's employee, Scottie Epperson, arrived at the Insured Property a few days later and was distraught at the damage to the building. (Epperson Dep., Doc. 25, Pg. ID 575-76.)

### II. The Insurance Policy

Langley held a policy ("Policy") for the Insured Property through Defendant Lexington Insurance Company from June 28, 2021, through June 28, 2022. (Epperson Decl., Doc. 28-2, ¶14; *see also* Policy, Doc. 3, Exhibit A, Pg. ID 120-182.) The Policy is an "all-risk" policy that provides coverage for all direct physical loss or damage to the property, unless the loss is excluded or limited within the Policy itself. (Policy, Doc. 3, Pg. ID 131-138, 156.) The Policy provided for several loss exclusions, including a Vandalism Exclusion. (*Id.* at Pg. ID 156.) This exclusion bars recovery for losses caused by vandalism, unless the vandalism "results in a Covered Cause of Loss," at which point the Policy will pay for damage caused by the Covered Cause of Loss. (*Id.*)

The Policy also included a vacancy loss condition provision, which limits coverage where an insured building has been vacant for at least sixty days prior to the loss. (*Id.* at Pg. ID 155.) But, the policy had a Vacancy Permit, which states that the vacancy loss condition does not apply to the Insured Property, except for damage from certain

2

denoted "Excepted Causes of Loss." (*Id.*) If, while the building was vacant, one of these Excepted Causes of Loss created damage to the property, then the policy would not cover that loss. (*Id.*) On the Vacancy Permit section of Plaintiff's Policy, a schedule lists two potential Excepted Causes of Loss: Vandalism and Sprinkler Leakage. (*Id.*) Next to those losses are two columns labeled "building number" and "premises number," and the word "all" is listed under each of those columns. (*Id.*) Andy Shafer, the insurance broker for the Policy, stated that coverage of vacant building losses from vandalism or sprinkler leakage is "nonnegotiable," that is, they are never covered losses, even with Vacancy Permits. (Shafer Dep., Doc. 30-8, Pg. ID 1731.)

### III.    The Claim

Langley notified Defendant of the loss on the same day his agent, Plattner, discovered the water damage. (Epperson Decl., Doc. 28-2, ¶ 11.) Defendant initiated its investigation soon after, assigning David Rademacher as the investigator and adjuster for Plaintiff's claimed loss ("Claim"). (Rademacher Email, Doc. 30-14.) Defendant, through Rademacher, assembled a team to assist in the investigation, including a building consultant, industrial hygienist, and forensic mechanical engineer. (Rademacher Dep., Doc. 26, Pg. ID 908-09, 937, 982, 985-87.) Rademacher then contacted Cincinnati Water Works, which confirmed that water began flowing from the building's fire suppression system sometime during the billing period of July 12, 2021, to August 11, 2021, and stopped flowing on September 17, 2021. (*Id.* at Pg. ID 1000-02.) Rademacher also requested additional information from Plaintiff to assist in the investigation but found Plaintiff's responses insufficient. (*Id.*) The investigation eventually revealed that an

individual or several individuals broke into the Insured Property sometime between July 12, 2021, and August 11, 2021, and vandalized the property, in part by striking sprinkler heads in the building's fire suppression system. (Epperson Decl., Doc. 28-2, ¶¶ 12-13.) The damage caused the sprinkler heads to activate, ultimately releasing over one million gallons of water from the building's sprinkler system. (Rademacher Dep., Doc. 26, Pg. ID 955–960, 1000–04.)

After several months of investigation, Defendant sent Plaintiff a Denial Letter, denying Plaintiff's claim for the water damage caused by the broken sprinkler system. (Epperson Decl., Doc. 28-2, ¶12; *see also* Denial Letter, Doc. 3, Exhibit B, Pg. ID 183-90.) In the Denial Letter, Defendant cited both to the Vandalism Exception and Vacancy Permit Excepted Causes of Loss of the Policy as grounds for denial. (Denial Letter, Doc. 3, Exhibit B, Pg. ID 183-90.) The letter also included language from the Duties in the Event of a Loss or Damage provision of Plaintiff's Policy, as well as an excerpt from the Limitations section of the Policy. (*Id.*)

## PROCEDURAL POSTURE

On December 20, 2022, Plaintiff Fred R. Langley brought this action in Hamilton County Court of Common Pleas. (Compl., Doc. 3.) The Complaint alleged breach of contract, bad faith, and requested a declaratory judgment against Defendant Lexington Insurance Company. (*Id.*) On January 26, 2023, Defendant removed this action to this Court based on diversity jurisdiction. (*See* Notice of Removal, Doc. 1.) On December 19, 2023, upon the death of Mr. Langley, Plaintiff moved to substitute Scottie Epperson, Co-Executor of Mr. Langley's estate, as Plaintiff. (Doc. 20.) The Court granted the unopposed

4

Motion and substituted Mr. Epperson for Mr. Langley as the Plaintiff in this matter. (12/27/2023 Notation Order.) On September 4, 2024, Defendant filed its Motion for Summary Judgment (Doc. 28). Plaintiff filed his Motion for Partial Summary Judgment (Doc. 29) the same day.

## LAW

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point to specific facts showing a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).

Moreover, a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element on which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## ANALYSIS

As a preliminary matter, Plaintiff's Motion raises the issue of the governing law in this dispute. (Plaintiff's Motion, Doc. 28, Pg. ID 1441.) Defendant does not address the issue in its briefing. Since the choice of law will impact the Court's analysis of both Motions, the Court will first address which law controls. It will then turn to each of the parties' Motions for Summary Judgment in turn.

### I. Choice of Law

Plaintiff points out that its Policy does not contain a choice of law provision, leaving this determination to the Court. (Plaintiff's Motion, Doc. 28, Pg. ID 1441.) "It is well-settled that a federal court sitting in diversity must apply the choice of law rules of the state in which it sits." *Charash v. Oberlin Coll.*, 14 F.3d 291, 296 (6th Cir. 1999). Ohio's choice-of-law rules are governed by the Restatement (Second) of Conflict of Laws. *Id.* The Restatement outlines that, in the context of a breach of contract claim, courts must consider the following factors: (1) the place of contracting; (2) the place of negotiation; (3) the place of performance; (4) the location of the subject matter; and (5) the domicile of the contracting parties. *Hartford Accident & Indem. Co. v. FFP Holdings, LLC*, 490 F. Supp. 3d 1226, 1235 (N.D. Ohio 2020). Plaintiff contends that four of the five factors favor the application of Tennessee law. (Plaintiff's Motion, Doc. 28, Pg. ID 1441.) The Court will consider each factor in turn.

On the first, second, and fifth factors, Plaintiff points out that the Policy "was obtained in Tennessee through the use of an insurance broker located in Tennessee; it was sent by [Defendant] to Tennessee . . . , and the policyholder is domiciled in

Tennessee." (Epperson Decl., Doc. 28-2, ¶¶ 18-20.) Defendant does not dispute any of these claims. The Court therefore agrees that the first, second, and fifth factors favor the application of Tennessee law.

As to the third factor, the place of performance, Plaintiff points out that "Ohio courts have consistently held the place of performance of an insurance policy is the place of the payment of the insurance benefits." (Plaintiff's Motion, Doc. 28, Pg. ID 1442 (quoting *Hartford*, 490 F. Supp. 3d at 1235) (cleaned up).) And, the Policy's declarations page for the named insured, Langley, lists an address located in Tennessee; this is the address where Defendant would send benefit payments. (*Id.*; *see also* Epperson Decl., Doc. 28-2, ¶ 21.) The Court finds that the place of performance is indeed Tennessee.

Only the fourth factor weighs in favor of Ohio law. The location of the subject matter, the Insured Property, is indisputably located in Ohio. (Epperson Decl., Doc. 28-2, ¶ 22.) While Plaintiff points out that the two states' laws do not differ meaningfully with respect to interpretation of insurance contracts, the Court finds that the factors significantly weigh in favor of Tennessee. Thus, Tennessee law shall apply in interpreting the Policy. Having established the controlling law, the Court will now examine the merits of the parties' Motions.

## II.     Motions for Summary Judgment

As Plaintiff's Motion seeks only partial summary judgment on his first two claims for relief, the Court will address Plaintiff's and Defendant's arguments as to the breach of contract and declaratory judgment claims together. Then it will move onto Defendant's request for summary judgment on the remaining claims.

7

### a. Breach of Contract and Declaratory Judgment

Both Plaintiff and Defendant contend that they are entitled to summary judgment on Plaintiff's breach of contract and declaratory judgment claims. (Motions, Docs. 28, 29.) For summary judgment in the insurance context, "exceptions, exclusions, and limitations in insurance policies must be construed against the insurance company." *Allstate Ins. Co. v. Watts*, 811 S.W.2d 883, 886 (Tenn. 1991). But, "an unambiguous exclusionary clause precludes coverage, and the courts should give the words in exclusionary clauses their ordinary meaning." *Beef N' Bird of America, Inc. v. Continental Cas. Co.*, 803 S.W.2d 234, 237 (Tenn. Ct. App. 1990). Summary judgment on two claims here centers around whether there is any dispute as to the Policy's coverage of the Insured Property's water damage. Plaintiff states that Defendant's two bases cited in its Denial Letter, the Vandalism Exclusion and the Vacancy Permit, do not apply to the loss. (Plaintiff's Motion, Doc. 28, Pg. ID 1444, 1452.) Meanwhile, Defendant claims that both provisions apply, and each provides an independent bar to coverage. (Defendant's Motion, Doc. 29, Pg. ID 1578, 1580.)

### i.     Vacancy Permit

Looking first at the Vacancy Permit, neither party disputes that the Insured Property was vacant, triggering the vacancy loss condition. (Plaintiff's Motion, Doc. 28, Pg. ID 1435; Defendant's Motion, Doc. 29, Pg. ID 1578.) But, Plaintiff asserts that the Vacancy Permit "bolsters [Plaintiff's] claim for coverage." (Plaintiff's Motion, Doc. 28, Pg. ID 1452; Plaintiff's Response, Doc. 31, Pg. ID 1971.) According to Plaintiff, the Vacancy Permit "deletes [the vacancy loss condition] from the [P]olicy." (Plaintiff's Motion, Doc.

8

28, Pg. ID 1452.) It "permits a vacancy condition without penalizing it like the default policy form would do." (Plaintiff's Motion, Doc. 28, Pg. ID 1452.) Plaintiff points out that the Permit's Schedule has and "Excepted Causes of Loss" chart, in which Defendant could have delineated causes of loss to which the Permit would not apply. (Plaintiff's Motion, Doc. 28, Pg. ID 1452-53; Plaintiff's Response, Doc. 31, Pg. ID 1971-72.) But, Plaintiff contends that no such causes of loss were marked on the Policy. (Plaintiff's Motion, Doc. 28, Pg. ID 1452-53; Plaintiff's Response, Doc. 31, Pg. ID 1971-72.) Instead, the Excepted Causes of Loss list "Vandalism" and "Sprinkler Leakage" as options, but the Policy does not have an "X" marked under either of those causes. (Plaintiff's Motion, Doc. 28, Pg. ID 1453; Plaintiff's Response, Doc. 31, Pg. ID 1971-72; *see also* Policy, Doc. 3, Pg. ID 155.) Importantly, the bottom of the same page reads: "This Vacancy Permit does not apply to the Excepted Causes of Loss indicated in the Declarations or by an 'X' in the Schedule." (Policy, Doc. 3, Pg. ID 155.) And, the declarations do not list vandalism or sprinkler leakage. (*Id.* at Pg. ID 123-24, 131-35.) In support, Plaintiff cites to a case with the same policy language and schedule, but—unlike the case here—the policy had an "X" under each cause of loss. (Plaintiff's Motion, Doc. 28, Pg. ID 1452-53 (citing *Exec. Prop. Dev., LLC v. Nautilus Ins. Co.*, No. 291368, 2010 WL 3718610, at *2 (Mich. Ct. App. Sept. 23, 2010)); Plaintiff's Response, Doc. 31, Pg. ID 1971-72.)

In Response, and in its own Motion, Defendant states that the vandalism and sprinkler leakage causes of loss were marked as excepted causes of loss. (Defendant's Response, Doc. 32, Pg. ID 2051; Defendant's Motion, Doc. 29, Pg. ID 1580.) Specifically, Defendant argues that "the 'X' in the Declaration indicates that the sprinkler leakage and

vandalism are Excepted Causes of Loss under the Vacancy Permit," as Rademacher testified. (Defendant's Response, Doc. 32, Pg. ID 2051; Defendant's Reply, Doc. 34, Pg. ID 2189.) This statement refers to the "X" in "Causes of Loss – Special" column found in the Policy's Declarations. (Policy, Doc. 3, Pg. ID 131.) However, the Court is unpersuaded by this argument. There is no reference to the Excepted Causes of Loss in the Declarations; nothing in the "Causes of Loss – Special" column makes mention of its applicability to the Vacancy Permit. Besides Rademacher's testimony that simply states their connection, no other evidence shows that the Declarations demarcate vandalism and sprinkler leakage as Excepted Causes of Loss under the Vacancy Permit.

Defendant also argues that, while the Schedule did not use an "X" to select the Excepted Causes of Loss, it did indicate their applicability by the use of "all" under "Prem. No." and Bldg. No," adjacent columns on the Schedule. (Defendant's Response, Doc. 32, Pg. ID 2051; Defendant's Reply, Doc. 34, Pg. ID 2189; *see also* Policy, Doc. 3, Pg. ID 155.) According to Defendant, the word "all" indicates that the two causes of loss applied to all buildings on the Insured Property, as opposed to situations like in *Nautilus*, where an insurer may have to differentiate which building had which loss exception with an "X." (Response, Doc. 32, Pg. ID 2051 (citing *Nautilus,* 2010 WL 3718610, at *2); Defendant's Reply, Doc. 34, Pg. ID 2189.) Furthermore, Defendant states that this interpretation is consistent with Shafer's testimony that the exclusion of some causes of loss in vacant properties, like vandalism and sprinkler leakage, is "nonnegotiable." (Defendant's Response, Doc. 32, Pg. ID 2051; Defendant's Reply, Doc. 34, Pg. ID 2189; *see also* Shafer Dep., Doc. 30-8, Pg. ID 1731.) But, the Court finds that the applicability of the

10

Vacancy Excepted Causes of Loss is still debatable. While the policy language is unambiguous, the use of the word "all," rather than an "X," raises a genuine question of whether the policy included those excepted causes of loss in the Vacancy Permit. The Court deems neither Plaintiff's nor Defendant's argument, nor the evidence on the record, sufficient to show the lack of a genuine dispute as to whether denial of coverage was proper under the Vacancy Permit. Therefore, neither party is entitled to summary judgment on the breach of contract and declaratory judgment claims based on the applicability of the Vacancy Permit.

### ii. Vandalism Exclusion

Nevertheless, each party also contends that it is entitled to summary judgment on breach of contract and declaratory judgment through the Vandalism Exclusion. The parties do not dispute that the Insured Property experienced acts of vandalism that damaged the sprinkler system, releasing over one million gallons of water. (Epperson Decl., Doc. 28-2, ¶¶ 12-13; Verticchio Letter, Doc. 3, Pg. ID 201; Defendant's Response, Doc. 32, Pg. ID 2033.) While Defendant cited to the Vandalism Exclusion as grounds for denial, Plaintiff contends that the language of the Exclusion does not preclude coverage. (Plaintiff's Motion, Doc. 28, Pg. ID 1444; Plaintiff's Response, Doc. 31, Pg. ID 1969.)

In his Motion, Plaintiff relies on the Resulting-Loss Exception of the Vandalism Exclusion as evidence that the Policy should cover the Insured Property's loss. (Plaintiff's Motion, Doc. 28, Pg. ID 1444; Plaintiff's Response, Doc. 31, Pg. ID 1969.) The provision states that vandalism, or the willful and malicious damage to property, is not covered, unless "vandalism results in a Covered Cause of Loss," at which point Defendant "will

pay for the loss or damage caused by that Covered Cause of Loss." (*Id.*; *see also* Policy, Doc. 3, Pg. ID 167.) Plaintiff maintains that he seeks coverage of the resulting loss from the vandalism, the water damage caused by the sprinkler leakage, rather than the damage caused by the vandalism itself. (Plaintiff's Motion, Doc. 28, Pg. ID 1444; Plaintiff's Response, Doc. 31, Pg. ID 1969.)

In support of this argument, Plaintiff points to *Blaine Construction Corporation v. Insurance Company of North America*, 171 F.3d 343 (6th Cir. 1999). There, the plaintiffs suffered faulty workmanship at the insured property, which resulted in water leakage in the insulation. *Blaine*, 171 F.3d at 346-47. Although the policy did not cover rectifying faulty workmanship, it did contain an exception for coverage of "loss or damage from an insured [P]eril" that ensues from that faulty work. *Id.* at 347. The court ruled in the policyholder's favor, finding that the ensuing water damage was covered, although the repair of the workmanship was not. *Id.* at 349-51. Plaintiff compares the policy language and circumstances in *Blaine* to those here, where it seeks recovery for the loss ensuing from the vandalism. (Plaintiff's Motion, Doc. 28, Pg. ID 1447; Plaintiff's Response, Doc. 31, Pg. ID 1970.) Plaintiff cites several other cases where various courts found similarly for policyholders regarding "ensuing-loss" provisions. (Plaintiff's Motion, Doc. 28, Pg. ID 1447 (citing *Leep v. Trinity Universal Ins. Co.*, 261 F. Supp. 3d 1071, 1084 (D. Mont. 2017); *Great N. Ins. Co. v. John Watson Landscape Illumination, Inc.*, No. 12-CV-25, 2015 WL 1222090, at *4 (N.D. Okla. Mar. 17, 2015); *Eckstein v. Cincinnati Ins. Co.*, 469 F. Supp. 2d 444, 447 (W.D. Ky. 2007); *Yale Univ. v. CIGNA Ins. Co.*, 224 F. Supp. 2d 402, 421 (D. Conn. 2002).))

In fact, the Sixth Circuit analyzed the precise "resulting-from" language from this Policy in a similar case. (Plaintiff's Motion, Doc. 28, Pg. ID 1448; Plaintiff's Response, Doc. 31, Pg. ID 1970; Plaintiff's Reply, Doc. 33, Pg. ID 2083; *see O.L. Matthews, M.D., P.C., v. Harleysville Ins. Co.*, 826 F. App'x 508 (6th Cir. Sep. 9, 2020).) In *O.L. Matthews*, the faulty workmanship exclusion in the policy also contained the provision that any loss "resulting from" the faulty workmanship would be covered. *Id.* at 513. The plaintiffs' property had a roof that was improperly laid, which caused significant water damage inside the building. *Id.* The court found that while the policy would not cover repair of the roof, the "resulting-from" exception provided coverage for the resulting water damage. *Id.* at 508-14; *see also 19900 W Nine Mile, LLC v. Hanover Ins. Co.*, 676 F. Supp. 3d 534, 543 (E.D. Mich. 2023). Plaintiff argues that Sixth Circuit precedent thus "compels a ruling" in his favor with respect to the applicability of the vandalism exclusion. (Plaintiff's Response, Doc. 31, Pg. ID 1970.)

In its own Motion, and in response to Plaintiff's Motion, Defendant argues that the vandalism exception clearly precludes coverage of a loss caused by vandalism, such as the sprinkler leakage and related water damage. (Defendant's Motion, Doc. 29, Pg. ID 1579; Defendant's Response, Doc. 32, Pg. ID 2036.) Defendant notes several cases that have upheld vandalism exclusions in support of its argument. (Defendant's Motion, Doc. 29, Pg. ID 1579; Defendant's Response, Doc. 32, Pg. ID 2038.) In reply to Plaintiff's "resulting-loss exception" argument, Defendant states that an ensuing loss clause "does not cover loss caused by an excluded peril . . . and only covers loss caused by a separate and independent covered peril." (Defendant's Reply, Doc. 34, Pg. ID 2183 (citing

*Cincinnati Ins. Co. v. Tenneva, LLC*, No. 2:22-CV-21, 2023 WL 11760869 (E.D. Tenn. Nov. 1, 2023).) Defendant argues that Plaintiff is attempting to "resurrect coverage for the excluded vandalism damage by arguing that the water damage directly caused by the vandals is a separate and independent loss." (*Id.* at Pg. ID 2184.) But, according to Defendant, the damage to the Insured Property did not result from any other peril other than vandalism. (*Id.*) Defendant reiterates that the resulting damage must not be the "same excluded physical loss or damage." (Defendant's Response, Doc. 32, Pg. ID 2040 (quoting *HoneyBaked Foods, Inc. v. Affiliated FM Ins. Co.*, 757 F. Supp. 2d, 738, 745 (N.D. Ohio 2010) (cleaned up)).) Put differently, an ensuing loss provision is a "causation-in-fact breaking link in coverage exclusions, establishing that independent, non-foreseeable losses caused by faulty construction are covered in those rare cases where the reasonable damage expected to be caused by an excluded peril leads to another peril that causes damage beyond that normally expected." (*Id.* at Pg. ID 2042 (quoting *TMW Enters. v. Fed. Ins. Co.*, 619 F.3d 574, 577-79 (6th Cir. 2010) (cleaned up)).) In fact, "if the damage came naturally and continuously from the excluded peril, unbroken by any new, independent cause, the exclusion applies and the ensuing loss provision does not." (*Id.* (quoting *TMW Enters.*, 619 F.3d at 579) (cleaned up).)

In his Reply, however, Plaintiff points out that all of the policies in the cases that Defendant cites use different language than that of the Policy here and are, therefore, "inapposite." (Plaintiff's Reply, Doc. 33, Pg. ID 2084.) By contrast, *O.L. Matthews* and *19900 W Nine Mile, LLC* dealt with policies with "resulting-from" exceptions identical to the Policy here. (*Id.* at Pg. ID 2084-85.) Plaintiff characterizes Defendant's argument as

standing "only for the uncontroversial proposition that an exception to an exclusion cannot be so broad as to eviscerate the exclusion itself." (*Id.* at Pg. ID 2085.) The Court agrees. Defendant's argument as it relates to the proposition that an exception cannot obliterate an exclusion, while correct, is not dispositive of the issues here. To the extent that Defendant raises the interpretation of the ensuing-loss provisions from *TMW* and *HoneyBaked Foods*, the Court finds that these cases are distinguishable. As Plaintiff points out, where courts—including the Sixth Circuit—have examined the precise Policy language at issue here, they have found that resulting covered causes of loss are covered, even where an excluded loss is not. *See O.L. Matthews,* 826 F. App'x at 508-14; *19900 W Nine Mile*, 676 F. Supp. 3d at 543.

Nevertheless, Defendant maintains that the Vandalism Exclusion precludes coverage, even if the resulting-from exception would otherwise apply. (Defendant's Response, Doc. 32, Pg. ID 2045; Defendant's Reply, Doc. 34, Pg. ID 2186.) Defendant points to the language of the exception requiring that the resulting loss come from "a Covered Cause of Loss." (Defendant's Response, Doc. 32, Pg. ID 2045; Defendant's Reply, Doc. 34, Pg. ID 2186; *see also* Policy, Doc. 3, Pg. ID 167.) The Policy defines a Covered Cause of Loss as "Risks of Direct Physical Loss unless the loss is: (1) Excluded in Section B., Exclusions; or (2) Limited in Section C., Limitations." (Policy, Doc. 3, Pg. ID 156.) Defendant notes two provisions in the Policy that render the sprinkler leakage an uncovered cause of loss: continuous water leakage and mold exclusions. (Defendant's Response, Doc. 32, Pg. ID 2045-46, 2048; Defendant's Reply, Doc. 34, Pg. ID 2186-87.) If the sprinkler leakage is not a Covered Cause of Loss, then the resulting-from exception

to the Vandalism Exclusion does not apply. (Defendant's Response, Doc. 32, Pg. ID 2045-46, 2048; Defendant's Reply, Doc. 34, Pg. ID 2186-87.)

To start, Defendant points to the provision that excludes "loss or damage arising out of the continuous or repeated seepage or leakage of water," which includes leakage "that occurs over a period of 14 days or more." (Defendant's Response, Doc. 32, Pg. ID 2046; Defendant's Reply, Doc. 34, Pg. ID 2186.) Defendant notes that the undisputed evidence reveals that the water continuously leaked from the sprinklers into the Insured Property's building for more than fourteen days. (Defendant's Response, Doc. 32, Pg. ID 2046; Defendant's Reply, Doc. 34, Pg. ID 2186.) Plattner visited the property on September 17, 2021, and immediately witnessed the water pouring out of the building. (Defendant's Response, Doc. 32, Pg. ID 2046; *see also* Epperson Decl., Doc. 28-2, ¶ 11.) Then, during the course of his investigation, Rademacher discovered from Cincinnati Water Department records that the water began flowing sometime during the billing period of July 12, 2021, and August 11, 2021, and stopped flowing on September 17, 2021. (Rademacher Dep., Doc. 26, Pg. ID 1000-02; *see also* Cincinnati Water Department Records, Doc. 26-12, Pg. ID 1390.) Thus, Defendant asserts that the continuous leakage of water exclusion bars the claim, since it is undisputed that water flowed for more than fourteen days. (Defendant's Response, Doc. 32, Pg. ID 2047-48.)

But, Plaintiff states that the water flow from the sprinklers was not merely gradual "seepage" or "leakage," and that Defendant is mischaracterizing the event. (Plaintiff's Reply, Doc. 33, Pg. ID 2095.) Plaintiff points to several cases interpreting the terms "leakage" and "seepage" to mean slow drips or oozes, including a case that found

"sprinkler leakage" implies an accidental spill, rather than a release of water due to intentional acts. *Saiz v. Charter Oak Fire Ins. Co.*, 06-CV-1144, 2007 WL 2701398, at \*7 (D. Colo. Sept. 12, 2007).

Yet, the Court is tasked with considering the whole provision, which includes "continuous or repeated seepage or leakage, or the presence or condensation of humidity, moisture, or vapor." (*See* Policy, Doc. 3, Pg. ID 158.) Reasonable interpretation of an insurance contract involves "giving the language its usual and ordinary meaning," and courts often turn to dictionary definitions to do so. *See Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.,* 216 S.W.3d 302, 305 (Tenn. 2007) (quotation omitted). Though "seep" means "to flow or pass slowly through fine pores or small openings," the word "leak" conveys a broader meaning: "to enter or escape through an opening usually by fault or mistake." *Seep*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/seep (last visited Apr. 16, 2025); *Leak*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/leak (last visited Apr. 16, 2025). And, in an apparent nod to the ordinary meaning of the word, the parties have referred to the water flow as "sprinkler leakage" throughout their briefings and discovery. (*See* Plaintiff's Motion, Doc. 28, Pg. ID 1453; Defendant's Motion, Doc. 29, Pg. ID 1581; Shafer Dep., Doc. 30-8, Pg. ID 1731.) Plaintiff did not take issue with the term "leakage" when addressing the term under Excluded Causes of Loss of the Vacancy Permit. (Plaintiff's Motion, Doc. 28, Pg. ID 1452-53.)

In light of the ordinary meaning of these words, the Court is unconvinced by Plaintiff's argument that these terms only implicate a slow drip caused by an accident.

By including the term "leakage," the provision encompasses the escape of water, irrespective of flow rate or total volume. *See, e.g., Landrum v. Allstate Ins. Co.*, No. 5:18-CV-458, 2019 WL 5068656, at *3 (M.D. Ga. Oct. 9, 2019), *aff'd*, 811 F. App'x 606 (11th Cir. 2020) (contemplating the definitions of "leakage" and "seepage" and concluding that, by including both words, the policy "clearly indicates the intention to exclude *any* escape of water, including that which is slow-moving and that which is not"); *Karon v. Safeco Ins. Co. of Am.*, No. 20-CV-1522, 2021 WL 3419037, at *3 (D. Ariz. Aug. 5, 2021) (finding that "seepage or leakage" covered a "ruptured water line dispensing 1,000 gallons of water per day") (citing *Dananan v. Am. Fam. Mut. Ins. Co.*, 2019 WL 4855140, at *4 (D. Nev. Sept. 30, 2019) (rejecting "gradual or low volume water event" as a definition of "leakage" because "dictionary definitions of the term refer to fluid being released but not necessarily to the volume of the release")). And, while Plaintiff states that the term "leak" refers to accidental spillage, the Merriam-Webster definition states that it "usually" involves the escape of a liquid through "a fault or mistake." In any event, neither party disputes that the vandals are faulted with causing the escape of water by damaging the sprinklers. Indeed, courts have also upheld continuous leakage exclusions when the source of the leak was an intentional act. *K.V.G. Props., Inc. v. Westfield Ins. Co.*, 296 F. Supp.3d 863, 870 (E.D. Mich. 2017), *aff'd*, 900 F.3d 818 (6th Cir. 2018) (granting summary judgment to insurer where the continuous water leakage exclusion applied to water seepage caused by growth of marijuana plants, an intentional act).

In further support of its argument, Defendant points to cases where courts have upheld the water seepage and leakage exceptions for water flows. (Defendant's Reply,

Doc. 34, Pg. ID 2187.) In one such case, a broken pipe caused water to flow out "at a substantial rate," and the court upheld the water seepage exception as a bar to coverage. *Mut. Redevelopment Houses v. Greater N.Y. Mut. Ins. Co.*, 204 A.D.2d 145, 146-47 (1994). While Plaintiff states that the damage in these cases "took years to be detected," and thus not the same as the damage in this case, at least in *Mutual Redevelopment*, the delay in detection was due to the location of the broken pipe under the building slab. *Id.* at 146; *see also* Plaintiff's Reply, Doc. 33, Pg. ID 2097. The insured only noticed the water because of a renovation project near the broken pipe, not because it took years for the water to accumulate. *Id.* The sprinkler leakage here similarly resulted in water flowing at a substantial rate, albeit in a more noticeable area. So, despite Plaintiff's claims, courts have applied the continuous seepage and leakage exception to continuous water flows. Given the provision's unambiguous language excluding "loss or damage arising out of the continuous or repeated seepage or leakage of water," paired with the body of case law interpreting this exclusion, and the parties' use of the term "sprinkler leakage" throughout the briefings, the Court finds that the water leakage exception applies to the sprinkler leakage here.

Defendant also points to the Mold Exclusion, which states that it will not pay for damage caused by "Fungus, Wet Rot, Dry Rot, and Bacteria," which includes mold and mildew, unless that loss results in a "specified cause of loss," in which case the Policy will cover up to $15,000. (Defendant's Response, Doc. 32, Pg. ID 2048; Defendant's Reply, Doc. 34, Pg. ID 2187-88.) A specified cause of loss is defined as: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage

19

from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; or water damage. (Defendant's Reply, Doc. 34, Pg. ID 2187-88 (cleaned up) *see also* Policy, Doc. 3, Pg. ID 164.) Notably, fire extinguishing equipment refers to personal property, not permanently installed sprinkler systems. (*Id.*) Additionally, water damage must be "accidental" in order to be excepted; the water damage here was caused by intentional acts of vandalism. (*Id.*) Also of note, the Vandalism Exclusion Endorsement erases vandalism from the list of Specified Causes of Loss. (*Id.*) Thus, in Defendant's estimation, the loss caused by mold, which itself was not caused by a specified cause of loss, is not a Covered Cause of Loss under the Policy. (Defendant's Response, Doc. 32, Pg. ID 2048-49; Defendant's Reply, Doc. 34, Pg. ID 2187-88.) So, just as with the water leakage exclusion, the mold exclusion also bars coverage. (Defendant's Response, Doc. 32, Pg. ID 2049; Defendant's Reply, Doc. 34, Pg. ID 2188.)

Without directly attacking the applicability of the Mold Exclusion, Plaintiff replies that Defendant's use of the water leakage and mold exclusions is an attempt "to invoke brand new provisions as bases for denying coverage." (Plaintiff's Reply, Doc. 33, Pg. ID 2087.) Specifically, Plaintiff describes these exclusions as "independent bases for denying" the Claim. (*Id.* at Pg. ID 2088.) The Court disagrees. These two provisions directly relate to the applicability of the Vandalism Exclusion, which Defendant cited in its Denial Letter. Defendant uses these provisions to show that the resulting loss exception does not apply. In other words, Defendant is not making a new defense, but rather is clarifying further the applicability of the Vandalism Exception. The resulting

losses were not caused by Covered Causes of Loss. Put simply, the water seepage and mold exclusions support the contention that the Vandalism Exclusion bars coverage.

In sum, the Court finds Defendant's arguments as to Covered Causes of Loss persuasive. Assuming the water began flowing at the latest point in the July/August billing period, the time from that day to when Plattner discovered it still flowing on September 17 is indisputably longer than fourteen days, triggering the continuous water leakage exclusion. And, the parties do not dispute that the mold was caused by sprinkler leakage, which is not an exempted specified cause of loss under the Mold Exclusion. The policy is unambiguous as to Covered Causes of Loss: no covered cause of loss caused the damage that resulted from the vandalism. In other words, Defendant's denial of Plaintiff's Claim was properly rooted in the Vandalism Exception. The Court finds no genuine dispute of material fact as to whether the Policy barred coverage of these losses.

*      *      *

In conclusion, while the applicability of Vacancy Permit to Plaintiff's claim is still in dispute, no dispute exists as to whether the Vandalism Exclusion applies. The Denial Letter cited the Vandalism Exclusion as a bar to coverage. Although the analysis of the Vandalism Exclusion requires a deeper look at the policy's Covered Causes of Loss, the policy language surrounding the Vandalism Exclusion is unambiguous. *See Blaine,* 171 F.3d at 349. The resulting losses from vandalism (sprinkler leakage and mold) are not Covered Causes of Loss, and thus, the policy bars their coverage. Defendant is therefore entitled to summary judgment on the breach of contract and declaratory judgment claims.

### b. Bad Faith

The remainder of Defendant's Motion centers on Plaintiff's bad faith causes of action. Plaintiff asserts that the two different causes of action, one under Tennessee statute, and the other under common law, depend on the governing law in the dispute. (Plaintiff's Response, Doc. 31, Pg. ID 1972-73.) As the Court has discussed above, Tennessee law controls here; thus, the Court will address the claim for bad faith under Tenn. Code Ann. § 56-7-105. Since this statute precludes common law bad faith claims in Tennessee, and Ohio law does not apply here, Defendant is entitled to summary judgment on Plaintiff's common law bad faith claim. *See Cracker Barrel Old Country Store, Inc. v. Cincinnati Ins. Co.*, 590 F. Supp. 2d 970, 972 (M.D. Tenn. 2008). The Court will now proceed with analysis of Plaintiff's statutory bad faith claim.

Under Tenn. Code Ann. § 56-7-105, a plaintiff must establish: (1) that the insurance policy had become due and payable; (2) that the plaintiff made a formal demand for payment; (3) that the plaintiff then waited sixty days after that demand before filing suit; and (4) the refusal to pay was made in bad faith. *Tyber v. Great Central Ins. Co.*, 572 F.2d 562, 564 (6th Cir. 1978). A bad faith penalty is not appropriate, however, "when an insurer's refusal to pay rests on legitimate and substantial legal grounds." *Id.* (collecting cases). And, if the insurer unsuccessfully asserts a defense, as long as that defense was made in good faith, "the statute does not permit imposing of the bad faith penalty." *Nelms v. Tennessee Farmers Mut. Ins. Co.*, 613 S.W.2d 481, 484 (Tenn. App. Ct. 1978).

Plaintiff asserts that he has easily met the first, second, and third elements of Tenn. Code Ann. § 56-7-105, stating that its own Motion explains why the claim became payable

and due under the Policy terms. (Plaintiff's Response, Doc. 31, Pg. ID 1973.) And, Plaintiff's attorney sent the demand letter to Defendant well over sixty days before commencing suit. (*Id.*) Finally, Plaintiff explains how it has also met the fourth element, when viewing the evidence in the light most favorable to him. (*Id.*) Plaintiff makes the same arguments as those on which he based his request for partial summary judgment, which the Court will not reiterate here. (*Id.* at Pg. ID 1974.) Essentially, Plaintiff claims that the Vandalism Exclusion and Vacancy Permit provisions, on which Defendant denied the Claim, were neither legitimate nor substantial legal grounds for denial. (*Id.*) Thus, Plaintiff argues that he meets all four elements of statutory bad faith and Defendant is not entitled to summary judgment on that claim. (*Id.*)

Yet, Defendant disagrees. (Defendant's Reply, Doc. 34, Pg. ID 2190.) Defendant does not dispute that Plaintiff sent a demand letter and waited at least the requisite sixty days before filing suit, but instead contends that Plaintiff has not met either the first or fourth element. (*Id.*) Rather, Defendant argues that it did not act in bad faith when denying Plaintiff's Claim. (Defendant's Motion, Doc. 29, Pg. ID 1583.) In support of this, Defendant first points to case law establishing what it means for the Policy to become due and payable. (Reply, Doc. 34, Pg. ID 2192. (citing *6111 Ridgeway Group, LLC v. Phila. Indem. Ins. Co.*, No. 15-2561, 2016 WL 1045570 (W.D. Tenn. Mar. 15, 2016)).) In *6111 Ridgeway Group*, the policy's Loss Conditions stated that the insurer's obligation to pay arises after the parties have reached an agreement on the amount of loss and the appraisal award has been made. 2016 WL 1045570, at *5. The court found that neither of those conditions had occurred, so it concluded that the plaintiff had failed to meet the first element of bad faith

under Tenn. Code Ann. § 56-7-105. *Id.* at *5-6. The Policy here contains similar language on the conditions of loss, and no evidence on the record shows that the parties have reached an agreement on the loss or that an appraisal award has been made. (Defendant's Reply, Doc. 34, Pg. ID 2192.) Thus, the Policy is not payable and due; Plaintiff has failed to meet the first element. (*Id.*)

As to the fourth element, Defendant reiterates its same arguments from earlier in its Motion that its denial was based on "substantial legal authority supporting its position." (Defendant's Reply, Doc. 34, Pg. ID 2191.) As such, the denial was not made in bad faith. (*Id.* at Pg. ID 2190.) Additionally, in the event that the Court finds the Policy does not bar the Claim, Defendant's potentially incorrect denial was still made in good faith. (*Id.* (quoting *Nelms*, 613 S.W.2d at 484).) Defendant points to its conduct during the investigation to support its contention of a good faith denial. (*Id.*) First, Defendant commenced its investigation within two days of Plaintiff notifying it of the loss. (*Id.*) Rademacher, assigned to investigate and adjust this Claim, assembled a team of several experts, including an industrial hygienist, forensic mechanical engineer, and building consultant. (*Id.* at Pg. ID 1584.) Rademacher also contacted Plaintiff for information to assist with the investigation but claims that Plaintiff did not provide all requested information. (*Id.*) Defendant's insurance agent advised Plaintiff that Defendant made "diligent attempts to find coverage," but ultimately found that the loss resulted from non-covered losses. (*Id.*)

The Court finds that Plaintiff has failed to establish two of the four elements for a bad faith claim. First, it is undisputed that the Loss Conditions have not been met,

meaning the Policy is not payable and due. On the first element alone, Plaintiff's bad faith claim must fail. But, examining the fourth element, the Court has established that the Policy bars Plaintiff's recovery based on the grounds for denial that Defendant outlined in its letter. Finding that the Vandalism Exclusion provides legitimate grounds for disputing the claim, and indeed bars the Claim, the Court concludes that Plaintiff has also failed to establish the fourth element. There is no genuine dispute that Plaintiff has failed to meet his burden to show all four elements of a bad faith claim. Therefore, Defendant is entitled to summary judgment on Plaintiff's claims for bad faith under Tenn. Code. Ann. § 56-7-105.

## CONCLUSION

Based on the foregoing reasons, the Court **ORDERS** the following:

1. Plaintiff's Motion for Partial Summary Judgment (Doc. 28) is **DENIED**;

2. Defendant's Motion for Summary Judgment (Doc. 29) is **GRANTED**;

3. Summary Judgment is **ENTERED** in favor of Defendant on all of Plaintiff's claims; and

4. This case is **TERMINATED** from the Court's docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

25